WILLIAM G. MOORE *v.* GRAND TRUNK RAILWAY COMPANY.

February Term, 1919.

Present: WATSON, C. J., POWERS, TAYLOR, and MILES, JJ., and FISH, SUPR. J.

Opinion filed October 7, 1919.

*Master and Servant—Injury in Interstate Commerce—Jury Question—Liability for Wrongful Acts of Servant—Res Ipsa Loquitur—Instructions—Future Damages.*

In a servant's action against a railroad, under the Federal Employers' Liability Act, for injuries received while coaling an engine, constantly used in international commerce, at a divisional point where all incoming and outgoing trains were interstate or international, the question whether the plaintiff and the engine were engaged in an act so closely related to international or interstate commerce as to be practically a part of it was for the jury.

If, in placing the engine to be coaled, defendant's servant negligently left the lever away from the center or the throttle open, thereby causing the engine to start automatically, or if he negligently left the brakes in such a way that the engine started by reason thereof, his wrongful acts were in the performance of the duties of his employment, and the defendant is responsible for resulting injuries.

Where the plaintiff was injured by the starting of the engine he was coaling, and the surrounding circumstances were such as to create a reasonable probability, in the absence of explanation by the defendant, that the accident arose from want of proper care, the principle *res ipsa loquitur* is applicable.

The court properly submitted the question of future damages to the jury; the consideration of the jury, in this respect, being confined to the evidence, and there being expert evidence tending to show the probable future progress of plaintiff's recovery from his injuries.

CASE FOR NEGLIGENCE under the Federal Employers' Liability Act. Plea, the general issue. Trial by jury at the April Term, 1918, Essex County, *Slack*, J., presiding. Verdict and

judgment for the plaintiff. The defendant excepted. The opinion states the case.

*John W. Redmond* for the defendant.

The plaintiff was not engaged in interstate. commerce at the time of the injury; there being a clear distinction between working *for* interstate commerce and working *in* interstate commerce, the latter only being within the meaning of the Federal Employers' Liability Act. *Shanks* v. *Delaware, L. & W. R. Co.,* 239 U. S. 556, 60 L. ed. 436; *Castonguay* v. *Grand Trunk Ry.,* 91 Vt. 371; *Delaware, L. & W. R. Co.* v. *Yurkonis,* 238 U. S. 439, 59 L. ed. 1397; *Ill. Cent. R. Co.* v. *Behrens,* 233 U. S. 473, 58 L. ed. 1051; *Chicago, B. & Q. R. Co.* v. *Harrington,* 241 U. S. 177, 60 L. ed. 941; *Erie R. Co.* v. *Welch,* 242 U. S. 303, 61 L. ed. 319; *Minneapolis & St. L. R. Co.* v. *Winters,* 242 U. S. 353, 61 L. ed. 358; *Giovio* v. *N. Y. C. R. Co.,* 160 N. Y. Supp. 1026; *C. R. R. Co. of N. J.* v. *Paslick,* 239 Fed. 713; *Hudson & M. R. Co.* v. *Iorio,* 239 Fed. 855; *O'Dell* v. *Southern Ry. Co.,* 248 Fed. 343; *Bumstead* v. *Mo. Pac. Ry. Co.,* (Kan.) 162 Pac. 347; *I. C. R. Co.* v. *Archer* (Miss.) 74 So. 135; *McBain* v. *No. Pac. Ry. Co.,* (Mon.) 160 Pac. 654; *Lehigh Val. R. R. Co.* v. *Barlow,* 244 U. S. 183, 61 L. ed. 1070; *Ill. Cent. R. Co.* v. *Perry,* 242 U. S. 292, 61 L. ed. 309; *L. V. R. Co.* v. *Barlow,* 244 U. S. 183; *N. Y. C. R. Co.* v. *White,* 243 U. S. 188; *Raymond* v. *C. M. & St. P. Ry. Co.,* 243 U. S. 43; *Jackson* v. *Chic. M. & St. P. R. Co.,* 210 Fed. 495; *Bravis* v. *Chic. M. & St. P. R. Co.,* 217 Fed. 234; *Chicago & E. R. Co.* v. *Steele,* (Ind.) 108 N. E. 4.

*Amey & Cameron* and *Porter, Witters & Harvey* for the plaintiff.

WATSON, C. J.    This action, brought under the Federal Employers' Liability Act of 1908, is for personal injuries suffered by the plaintiff at Island Pond, this State, on July 13, 1917, while engaged in coaling defendant's locomotive, No. 1018 (hereinafter referred to by number). The defendant is a common carrier by railroad, engaged in commerce between several states, and between states and a foreign nation. Thirty-two miles of its road are in Vermont, passing through the village of Island Pond, which is a divisional point. Seventeen miles west of Island Pond

the road passes into Canada, continuing to Montreal and beyond. The village' of Norton Mills is on this line at the Canadian border, but in Vermont. Fifteen miles east of Island Pond the road passes into the State of New Hampshire and on to Portland, Maine. All trains coming into Island Pond from either direction stop at that place; and every engine coming in hauling a train, finishes its trip there, is detached from the train, and taken to the coal shed to be coaled. After the coaling is done, the engine is run to the ash pit where the fire is either cleaned or dumped, as may be required. It is then taken to the turntable, turned, and placed in the roundhouse. When fired up and filled with water, it is ready for further serviceable action.

The declaration contains several counts; but it appears from the record that the negligence of which the plaintiff complained and on which he relied for a recovery, was either that the engine was negligently started by the man (Earl Norris) in charge, or was by him negligently left in such a way that it started by its own action. In considering the questions presented for review, we observe these limits.

At the close of the evidence, defendant moved for a directed verdict on the grounds that on the evidence, taken in its most favorable light to the plaintiff: (1) Defendant was not guilty of actionable negligence;. (2) the starting of the engine by Norris was not an operation in the line of his duty, and if in the circumstances he started it, such act must have been for a purpose personal to himself or actuated by his own caprice; and (3) neither the defendant nor the plaintiff, at the time of the transaction wherein the latter was injured, was engaged in interstate commerce or in an act so closely related thereto as to be a part of it. On the exception saved to the overruling of this motion, rest the real contentions before us.

On the day of the accident, at five o'clock in the afternoon, 1018 arrived at Island Pond, hauling freight train No. 554, from Richmond, Canada, and, as usual, was detached from the train and left by the engineer near the coal chutes, to be coaled. The plaintiff was then employed by defendant in the coal shed, doing all kinds of work toward unloading coal and coaling engines. He had been employed doing such work at that place the biggest part of the time for a large number of years. After the arrival of 1018, Norris, who was employed by defendant as a "fire dumper," and had been so employed between two and three

months, asked the plaintiff to coal it as soon as he could, and get it up to the ash pit, so Norris could get home for supper by six o'clock. Thereupon the two got onto the engine, and Norris moved it to the right place to receive coal, stopping it there. The engine being thus placed, the plaintiff, standing on the tender, was attempting to pull down the chute through which coal would be delivered into the tender, when he received the injuries complained of.

This engine was ordered for freight train No. 551, which left Island Pond at six o'clock the next morning, and went with that train to Richmond. There was no direct evidence showing whether this order was general, covering some length of time, or special, for that trip only; nor that it was issued before the accident; nor that the injury was suffered by the plaintiff when engaged in coaling the engine for that run. But the undisputed evidence showed that on all week days (the trains did not run Sundays) during the entire month of July this engine was making that same run, that is, it went from Island Pond to Richmond one day and returned from Richmond to Island Pond the next day, except on July 3d another engine was used to haul that train; that 1018 was used for no other purpose during that month; that it was on that run for the year 1917, except there might have been one or two trips when another engine was substituted. It further appeared that on March 11th this engine arrived from Richmond at 5:45 a. m., was used in switching service later in the day, and left with a special freight train for Richmond at 5 p. m.; that on January 28th (which by common knowledge was Sunday) it was ordered for a work train to Norton Mills at 8 a. m., doing work on defendant's roadbed; that on June 24th it went from Island Pond to Richmond and came back on the 27th; that between September 11th and November 12th, it was out of Island Pond (the witness thought) in defendant's shop in Montreal, as it was given general repairs about that time; that it left Island Pond on December 22d and came back on the 27th. Every freight train and every passenger train which comes into, or leaves, Island Pond, is interstate or international.

In simple form the question under discussion comes to this: Engine 1018, making its regular trips, arrived in Island Pond at 5 p. m., on the day of the accident, as an instrumentality of international and interstate commerce, and left there at 6 a. m., next morning, as such an instrumentality. Did it by being de-

tached from the train it hauled in, lose its international and interstate character so that the plaintiff, when engaged in coaling it, was not employed in such commerce, within the meaning of the Employers' Liability Act?

Supplying the locomotive with coal and water, and looking after the fire, on coming into that terminal, were acts essential to the locomotive's further efficient operation, but having no tendency to show an interruption in its international work; but rather, in the circumstances including the time of day and the early hour of its departure the next morning on its regular trip, they were acts which might reasonably be considered as tending to show preparation for that run. Considering therewith that the evidence was such as (we think) reasonably to warrant a finding that this locomotive was destined for such run, by an order issued prior to the time of the accident, it seems clear that, as the case stood, the question of whether the engine and the plaintiff were, at the time in question, engaged in an act so closely related to international or interstate commerce as to be practically a part of it, was for the jury to determine under proper instructions. *Lynch* v. *Central Vermont Ry. Co.,* 89 Vt. 363, 95 Atl. 683; *Castonguay* v. *Grand Trunk Ry. Co.,* 91 Vt. 371, 100 Atl. 908. It has been held by the Supreme Court of the United States that if an employee is injured while preparing an engine for an interstate trip, he is entitled to the benefits of the Federal Employers' Liability Act, although the accident occurred prior to the actual coupling of the engine to the interstate cars. *New York C. & H. R. R. Co.* v. *Carr,* 238 U. S. 260, 59 L. ed. 1298, 35 Sup. Ct. 780; *North Carolina R. Co.* v. *Zachary,* 232 U. S. 248, 59 L. ed. 591, 34 Sup. Ct. 305, Ann. Cas. 1914 C, 159.

The other two grounds of the motion are so connected as to make it more convenient to consider them together. It is unnecessary to repeat the facts already stated leading up to spotting the engine to receive coal. Norris was the only person in the cab. Concerning just what took place resulting in the injury, there was no direct testimony except that given by the plaintiff and by Norris (called as a witness by plaintiff), the only persons present, or having any knowledge thereof. The former testified that, standing on the side of the tender, the engine being at a standstill, he reached up with the poker having a hook on the end of it, to pull the chute down, and as he

got hold of the chute and "went to give a quick pull * * * the engine started quick," his feet went out from under him, and he fell over the side of the tender, to the ground.   The latter testified that just before the plaintiff fell the engine was standing still with the brakes set, the throttle closed, and the reverse lever in the center; that the witness did not move the engine after it was spotted to receive coal; that he watched the plaintiff and saw him when he went over; that plaintiff, when he fell, was reaching for the chute, but did not get hold of it; that the witness does not know whether plaintiff's feet slipped, or the poker slipped.

It should be noticed in this connection that in effect the plaintiff's testimony was that the engine started and simultaneously therewith he fell.   He did not undertake to state the cause of the engine's starting.   It should be further noticed that Norris simply says that *just before* plaintiff fell the engine was standing still, and that he did not move it.   He does not say that the engine did not start, nor that plaintiff's fall was not simultaneous therewith.   So in these important particulars there was no conflict in the testimony given by the two.

There was no evidence in the case tending to show that Norris moved the engine; on the contrary, the evidence precludes such a theory.   So the only inference that could be drawn as to the cause of the accident, was some defect in the engine, or want of care in managing and controlling it.   Since in the trial no claim of defect was made, the sole question on this branch of the case is:   Did the evidence fairly tend to show the efficient cause to have been negligence in managing and controlling the engine?   There was no evidence of such negligence, unless the principle *res ipsa loquitur* applies, concerning which, more anon.

It appeared that the track where the engine was placed in front of the chute was level.   One of plaintiff's witnesses, a locomotive engineer of much experience, being asked, as an expert, what had to be done to start an engine like 1018, when standing stock-still on the track on a location like that, answered: "Assuming that the engine was left properly at that place, the reverse lever would have to be moved away from the center a sufficient distance and the throttle opened, also assuming the engine was in a proper condition."   Continuing, the witness further testified that, assuming an engine like 1018 is standing still on a level, if the brakes are not properly set the engine may

start automatically without any other action on the part of the driver; also that if the throttle or the lever is not properly set, the engine so standing may start of its own motion. In cross-examination he said that in order to stop an engine of that kind, the steam must be shut off by pushing the throttle in, and the lever at the center controls the ports which let steam into the cylinders ·and, assuming the engine is in good condition, when the lever is in the center the ports are closed and no steam can get into the cylinders, and the engine cannot start, whether the brakes are on or off; that if the lever is far enough away from the center to overcome the lap of the valve over the steam ports to admit steam, or if the engine, by reason of being out of repair, leaks steam into the cylinders, the engine may start of its own motion. There was no attempt on the part of defendant to explain the happening of the accident.

It was conceded by defendant that in moving 1018 to the coal chute and spotting it there to be coaled, Norris was acting in the line of his duty; but in connection with this concession defendant claimed that if Norris moved the engine after it was thus spotted and just before the plaintiff fell, there was no reason for his so doing; and there was nothing to indicate it was in the line of his duty, because, admittedly, the engine was properly placed to be coaled, in the first instance. The case of *Ploof* v. *Putnam,* 83 Vt. 252, 75 Atl. 277, 26 L. R. A. (N. S.) 251, 138 Am. St. Rep. 1085, is relied upon as an authority for the proposition that if Norris moved the engine for his own purpose, or at his own caprice, defendant is not liable for injuries resulting therefrom. But since such a cause was completely negatived by the evidence, this position need not be further noticed. By that same authority, if, in placing the engine to be coaled, Norris negligently left the lever away from the center, or the throttle open, so that the steam escaped into the cylinders, by reason of which the engine started automatically, or if he negligently left the brakes in such a way that the engine could and did, by reason thereof, so start, his wrongful acts were in the performance of the duties of his employment, and the defendant is responsible for resulting injuries.

The evidence showed the accident to have been such as in the ordinary course of things does not happen where those having the management and control of a locomotive like the one in question, standing still on a level track, use proper care, and

the circumstances surrounding it were such as to create a reasonable probability, in the absence of explanation by the defendant, that the accident arose from want of proper care. Consequently the principle *res ipsa loquitur* is applicable. *Houston* v. *Brush & Curtis,* 66 Vt. 331, 29 Atl. 380; *Desmarchier* v. *Frost,* 91 Vt. 138, 99 Atl. 782. While this principle is of limited application, the unsuccessful attempt of the plaintiff to show the precise act of negligence did not prevent him from relying upon the doctrine of the maxim. *Golden* v. *Mannex,* 214 Mass. 502, 101 N. E. 1081; *Hull* v. *Berkshire Street Ry.,* 217 Mass. 361, 104 N. E. 747; *Cleary* v. *Cavanaugh,* 219 Mass. 281, 106 N. E. 998. The motion for a directed verdict was properly overruled.

All other questions presented in argument relate to the charge. The first of the exceptions of this class was to the submission to the jury of the question of interstate commerce; and the eighth was to the submission of the question of whether the locomotive started of itself. In effect, these two exceptions have already been disposed of.

The fifth, sixth, and seventh of these exceptions, relate to the charge touching the finding of the jury on the question as to whether, at the time of the plaintiff's injury, locomotive 1018 was engaged in interstate commerce, and the basis of such finding. We think the instructions in this respect were substantially in accord with the holdings above, on this branch of the case under the motion for a verdict, and without error.

Exception was taken to the charge on the question of future damages. The jury were instructed that it was proper for them to consider plaintiff's loss of time, not only up to the time of the trial, but also such inability and incapacity to work in the future, as they should find established by the evidence; that they must use the evidence as a basis for any allowance they might make in this regard; that it could not be done upon speculation or conjecture. Also that they had a right to include such damages for his pain and suffering, past and future, measured in the same way, as in their judgment, on the evidence, the plaintiff was entitled to. The grounds of the exceptions were that the length of time of such inability and incapacity to work, and the amount of future pain and suffering, were, on the evidence, matters of pure speculation. But we hardly think this was so. Apart from such evidence as could be given only by medical experts, the plaintiff testified fully regarding his injuries, his pain and

suffering, and his inability to work up to the time of giving his testimony. Expert evidence was introduced, showing the character and extent of his injuries, his physical condition since receiving them, including at the time of the trial, when an examination of the plaintiff was made by three physicians, witnesses in the case. One of these physicians attended him immediately after the accident, and thenceforth. He testified that one or two ribs underneath the right shoulder—about the third or fourth rib counting down—and one on the left side, were broken, from which he suffered much pain; that the examination made on the day of testifying, showed that plaintiff's ribs seemed all right, but he complained of a stiffness of the shoulder, and when he moved the shoulder blade, it, noticeably, did not move as the other one did, and there was a certain atrophy of the muscles of the right arm; that the examining physicians experimented by pricking him in the back with a large needle, and in some places he did not seem to feel it, seemed to feel it more on the left side than on the right, but still it was not entirely lost; that the atrophied condition of the back was due to the blow, and indicates trouble with the nerves; that the blow on the shoulder, and the fact that he did not feel the needle ''way out on the right side,'' show that the nerve is not as good; that his condition has improved, and the witness thought improvement would continue.

The other examining physicians testified to finding the same conditions, but more in detail. One of them said whether the plaintiff's recovery would be complete eventually, he could not say; that it was not impossible that he was having a beginning degeneration of the nerves from the terminal ends, and that this condition would grow worse, but the witness thought he would improve. The other physician had examined the plaintiff twice before within a week. He testified that he should not think the plaintiff would be well a year hence, and might be worse off; and, being asked what he would say as to plaintiff's being well within two years, the witness said such a case was very slow in recovery, and at plaintiff's age the prognosis was worse than though he were a young man.

The evidence showed that the nature and extent of plaintiff's injuries, his past improvement, and his condition at the time of the trial, were such as to render it practically impossible to tell, with any great degree of certainty, the length of time be-

fore complete recovery. Mere conjecture and speculation can form no basis for prospective damages. But the expert evidence tended to show the probable future progress of the improvement, and (in the opinion of one of the witnesses) that a year's time was too short, in which to make full recovery. The evidence furnished a reasonable basis for the belief that for a year, at least, the plaintiff's inability to work, and his pain and suffering, would continue. The consideration of the jury in this respect was, by the charge, expressly confined to the evidence. The plaintiff was entitled to have the question submitted to the jury, and we see no error in the instructions given. See *Ryder* v. *Vermont Last Block Co.*, 91 Vt. 158, 99 Atl. 733; *Wallace* v. *Pennsylvania R. R. Co.*, 222 Pa. 556, 71 Atl. 1086, 128 Am. St. Rep. 817; 8 R. C. L. 544, § 94.

*Judgment affirmed.*