OSCAR ANDERSON v. EASTERN MINNESOTA POWER COMPANY.[1]

April 17, 1936.

No. 30,761.

[1]Reported in 266 N. W. 702.

*Gillette & Meagher,* for appellant.

*M. B. Hurley* and *Marshall S. Snyder,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendant is engaged in the business of generating and distributing electric current in Kanabec and adjoining counties and as such owns and operates generators and distributing systems. The current is generated at centrally located plants and distributed throughout the territory by means of wires strung upon poles fitted with the usual appliances. Its customers are the inhabitants of cities and villages in that locality, including as well farmers who desire such service.

Plaintiff is a tenant farmer residing upon a state-owned farm in Kanabec county, near the village of Braham. In 1920 one Vitek, the then owner of the farm, procured the construction by defendant of a service line from defendant's high tension line located some distance to the north of his buildings. A portion of the route of this service line was laid through what had formerly been a shallow lake but which had been drained. As such the ground was somewhat soggy, and when rainy weather came the poles carrying the service wires swayed with the wind. At the end of this service line was erected what may be designated a transformer pole, located immediately to the east of the barn. Between this pole and the barn was the farm driveway.

The transformer is an instrumentality designed to reduce the high current carried by the service line to a lower voltage so as to make the reduced electric current suitable and serviceable for

domestic use. This instrument was attached near the top of the pole. It weighed something like 85 pounds. Beneath the same and connected therewith were the service wires, which extended south-westerly across the driveway and thence to the dwelling house. The transformer pole was obviously the one that bore the brunt of the burden of the swaying wires between it and the main service line.

Some time after the construction of the Vitek line a local tele-phone company strung its telephone wire upon these poles, a short distance below the high voltage wires, and extending up to the dwelling house.

Vitek evidently met with the hardships that followed the pros-perous years enjoyed during the war period. At any rate, he lost his farm and was compelled to move therefrom in the fall of 1930. Before moving therefrom he notified defendant that its service was no longer required. Accordingly, the service wires from beneath the transformer and extending toward the dwelling house were dis-connected. But the electric current was not shut off beyond; hence these lines carried the usual high current of 2,300 volts.

The transformer pole was located in the corner of the pasture. Next to the corner was a wire gate leading into the same. The high tension wire was not insulated, nor were there any warning signs of any kind.

When plaintiff moved upon the farm he did not make use of electric current. He knew nothing about the dangerous qualities of electricity. He had resided upon this farm something over two years prior to the date of the accident which occurred August 23, 1934.

About a week or ten days prior to the happening of the accident there had been quite a windstorm and one of the poles had broken. At that time defendant's servants repaired the line and claimed they made an inspection thereof, including this transformer pole. It is claimed in behalf of defendant that the men who made the repairs and inspection fully and adequately performed their duties in this regard.

On the morning of the day in question two of plaintiff's boys had hitched up a team to a farm wagon upon which was a light

hayrack. They were proceeding down the driveway when the top of the hayrack came in contact with the telephone wire. The horses became frightened, and, as a consequence, the hayrack was lifted by the wire so as to slide off the running gear of the wagon. Plaintiff observed the predicament the boys were in and went to their assistance. No harm was done to anything or anybody. Plaintiff noticed that the transformer pole was down so he went to see what the conditions were. There were pools of water near the butt of the pole, the result of a recent rain. He claims that as he stepped into or near the edge of a pool he was suddenly seized with a peculiar force which caused him to fall in an unconscious condition. He remembers nothing from then on. His boys procured his release. They found that his body was in some fashion tangled up with the electric wires. They took him into the house, where he remained two days. Medical aid was sought and procured. Over a period of some two months he went regularly to his physician for treatment, something like 30 of these treatments having been obtained.

The evidence shows that his left hand has been seriously crippled. The doctors testified that they considered the use of the hand to be reduced to the extent of 75 per cent. He had also received injuries toward the lower part of his back and his left leg, the use of which is impaired at least 25 per cent. In the opinion of his doctors his ability as a farm worker has been reduced at least 50 per cent. "There is an apparent loss of tissue by atrophy of the left hand, and there are contractions under the scar in the hand; also contractions under the scar in the buttock reaching in through the head of the biceps muscles and touching or associated with the sciatic nerve."

Shortly after the happening of the accident defendant's servants appeared upon the scene. At the point where the level of the ground around the pole met with the pole itself it was found to be rotten. One witness said, "Well, it was all rotted off." The part that had been in the ground was taken out and used at the trial as an exhibit; thus the trial court and jury had an opportunity of observing its condition. The remaining part of the pole was put to use by

defendant, a new hole being dug and the balance of the pole stuck into the ground. The transformer was then removed.

An expert for plaintiff, in explaining the situation created by a high tension wire coming in contact with the pool of water into which plaintiff fell, testified as follows:

"If this pool of water were substantially insulated from the part of the earth as a whole, that is by means of an intervening layer of dry earth, then the voltage of that pool of water would be substantially the voltage of this 2,300-volt conductor with respect to the ground. * * * a person walking along and having one foot on the ground and stepping into this pool of water with the other foot, he would have pass through him a very large current, depending upon the resistance of the material contact."

At the close of the trial defendant moved for an instructed verdict in its·behalf, claiming that no negligence had been shown and that plaintiff's contributory negligence as a matter of law precluded recovery. The motion was denied and the case submitted to the jury, resulting in a verdict for plaintiff of $4,000. Defendant met with an adverse order on its motion for judgment notwithstanding or new trial. The appeal is from that order.

■ The law applicable to the facts hereinbefore related is well settled. We think the court in Humphrey v. Twin State G. & E. Co. 100 Vt. 414, 421, 139 A. 440, 444, 56 A. L. R. 1011, 1018, accurately states the applicable rule:

"Electricity has come to be a necessary factor in almost all lines of activity. Its usefulness should not be impaired or curtailed. But it is highly destructive when it escapes control; its capacity for harm is but little reduced by distance; it is invisible and undiscoverable; it strikes instantly and without warning. We deem it of the highest consequence, especially in a rural state like ours where hunters, fishermen, and others roam the woods when lawful, almost at will, and where high tension electric lines run in every direction, and wire fences are in common and increasing use, that *those dealing in such a deadly agency should be accountable to all*

*whose likelihood of injury could reasonably be foreseen."* (Italics ours.)

Our own cases are to the same effect:

"Electric companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus. The degree of care varies with the danger involved. Where wires carry strong and dangerous currents of electricity a high degree of care must be exercised." 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 2996. See also Interstate Power Co. v. Thomas (C. C. A.) 51 F. (2d) 964, 84 A. L. R. 681; Anno. 14 A. L. R. 1023 and 56 A. L. R. 1021.

■ The case was tried and submitted upon specific acts of negligence. In a memorandum attached to the order here for review the court said: "The fact that the pole was deteriorated and that defendant had assumed the maintenance of it would appear to us to also bring in the rule of *res ipsa loquitur."* Defendant asserts that the doctrine or maxim cannot be applied in the instant case because (1) "plaintiff did not invoke the rule," (2) "the court did not instruct the jury" with respect to it, and (3) "the legal and factual background for the application of that rule is not found in our present situation."

That claim was squarely met and decided adversely to defendant's contention in Humphrey v. Twin State G. & E. Co. 100 Vt. 414, 139 A. 440, 56 A. L. R. 1011. Upon reargument in that case the court said (100 Vt. 424, 139 A. 440, 56 A. L. R. 1020):

"Nor is there any merit in the defendant's argument that by alleging specific acts of negligence and giving or offering evidence tending to support them a plaintiff forfeits his right to rely upon the maxim. It is directly contrary to the law as laid down in Moore v. Grand Trunk Ry. Co. 93 Vt. 383, 390, 108 A. 334, and Stewart v. Barre & M. Power & Traction Co. 94 Vt. 398, 401, 111 A. 526. By pleading more facts than he needed to the plaintiff did not obligate himself to prove them. Bosworth v. Bancroft, 74 Vt. 451, 453, 52 A. 1050; Woodhouse v. Woodhouse, 99 Vt. 91, 110, 130 A. 758. Nor did he estop himself by failing in his proof of such alle-

gations. His *prima facie* case was complete when he showed an injury proximately resulting from the escape of the defendant's current."

This court in Cullen v. Pearson, 191 Minn. 136, 140, 253 N. W. 117, 119, 254 N. W. 631, quoted with approval the text in 45 C. J. 1206, 1207:

"'* * * plaintiff is not deprived of the benefit of the doctrine from the mere introduction of evidence which does not clearly establish the facts or leaves the matter doubtful, * * * an unsuccessful attempt on the part of plaintiff to show the specific negligent act which caused his injury does not weaken or displace the presumption of negligence on the part of defendant arising from the facts of the case by virtue of the rule of *res ipsa loquitur.*" See also Borg & Powers Furniture Co. v. Clark, 194 Minn. 305, 308, 260 N. W. 316.

■ We find no difficulty in holding that the issues of defendant's negligence and plaintiff's contributory negligence were, upon the facts here appearing, for the jury, and that the evidence sustains the verdict.

■ We think the verdict, in view of plaintiff's serious and permanent injuries, cannot be said to be excessive; rather, it is conservative. See 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 2597.

Order affirmed.

I. M. OLSEN, JUSTICE (concurring specially).

I concur in the result.