Mary E. STEINBRECHER, individually and as trustee for heirs and next of kin of Michael E. Steinbrecher, deceased, Respondent (C1–85–2326),

Vicki E. Halliday, individually and as trustee for the next of kin of Charles W. Halliday, deceased, Respondent (C3–85–2327),

v.

McLEOD COOPERATIVE POWER ASSOCIATION, Appellant.

Nos. C1–85–2326, C3–85–2327.

Court of Appeals of Minnesota.

Sept. 2, 1986.

Kay N. Hunt, Minneapolis, for respondent (C1–85–2326).

Robert G. Johnson, Mankato, for respondent (C3–85–2327).

Clifford M. Greene, Minneapolis, for appellant.

Heard, considered and decided by PARKER, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

SEDGWICK, Judge.

Michael Steinbrecher and Charles Halliday were both electrocuted in a work accident on July 14, 1982. Their widows, respondents Mary Steinbrecher and Vicki Halliday, as individuals and trustees for the heirs, brought separate wrongful death actions which were consolidated for trial.

The jury found the McLeod Cooperative Power Association to be 58.4% negligent and each decedent to be 20.8% negligent. The jury awarded $1,112,650 to Mary Steinbrecher and $858,535 to Vicki Halliday. The trial court discounted cumulatively for fault of both decedents when entering judgment for each: Steinbrecher received $744,519.17 and Halliday $575,291.22.

McLeod Co-op moved for judgment notwithstanding the verdict or a new trial. Respondents cross review on amount of the

judgment. Appeal is from the amended judgment and denial of motion for a new trial. The cases are consolidated on appeal. We affirm as modified.

## FACTS

Michael Steinbrecher and Charles Halliday were teachers who painted houses during school breaks under the names S & H Painting or Steinbrecher Brothers. Lloyd and Abigail Voight hired the men in the spring of 1982 to paint their two and one-half story farmhouse and several outbuildings. Steinbrecher and Halliday were electrocuted when they attempted to raise a 40 foot aluminum extension ladder to complete painting near the roof of the homestead. There were no witnesses to the accident, but the ladder apparently fell backward into an uninsulated 7200 volt primary power line located 21 feet from the house. The widow of each decedent brought a separate wrongful death action against McLeod Cooperative Power Association (McLeod). In a consolidated trial, the jury found McLeod to be 58.4% negligent and each decedent to be 20.8% negligent. The trial court awarded judgment to Halliday and Steinbrecher solely upon the percentage of fault attributed to McLeod.

## ISSUES

1. Did the trial court err in ruling that decedents were held to the standard of reasonable care?

2. Did the trial court err in interpreting damages for pecuniary loss in a wrongful death action to include medical bills incurred by a plaintiff resulting from loss of emotional support from her deceased husband?

3. Did the trial court err in its trial or evidentiary rulings?

4. Was it error to limit the recovery to an amount corresponding to the negligence attributed to the McLeod Cooperative Power Association?

## ANALYSIS

Appellants argue that compliance with Minn.Stat. § 326.243 entitles them to judgment as a matter of law. The statute reads in part:

For the purposes of this chapter, the regulations and safety standards stated at the time the work is done in the then most recently published edition of the National Electrical Code * * * and the National Electrical Safety Code * * * shall be prima facie evidence of accepted standards of construction for safety to life and property * * *.

Minn.Stat. § 326.243 (Supp.1985).

Here the explicit requirements of the NESC were satisfied by placing the 7,200 volt line 21 feet from the house and 25 feet above the ground. Although these distances easily exceeded the code figures, respondents argue the Co-op did not comply with the NESC policy guidelines when the 7,200 volt uninsulated wire was routed into the farmyard.

In addition to technical considerations, the code also sets forth policy considerations.

§ 20. SCOPE, NATURE, AND APPLICATION OF RULES.

200. SCOPE OF RULES.

*     *     *     *     *     *

C. *Conformity with Good Practice*
Construction should be made according to accepted good practice for the given local conditions in all particulars not specified in the rules.

*     *     *     *     *     *

§ 21. GENERAL REQUIREMENTS APPLYING TO OVERHEAD AND UNDERGROUND LINES.

210. DESIGN AND CONSTRUCTION.
All electric supply and communication lines and equipment shall be of suitable design and construction for the service and conditions under which they are to be operated.

211. INSTALLATION AND MAINTENANCE.
All electric supply and communication lines and equipment shall be installed

and maintained so as to reduce hazards to life as far as practicable.

National Bureau of Standards, U.S. Dept. of Commerce, *National Electrical Safety Code* (6th ed. 1961).

■ Whether the 7,200 volt uninsulated line needed to be run into the middle of a farmyard at all was properly a question for the jury.

The definitive Minnesota transmission line decision is *Ferguson v. Northern States Power Co.,* 307 Minn. 26, 239 N.W.2d 190 (1976). Ferguson was shocked by the electrical current in a 28 foot, 8,000 volt wire while trimming trees. The court considered a strict liability rule, but left the decision to the legislature because of public policy implications. However, current transmission on such wires was found to be "a highly dangerous activity." *Id.* at 33, 239 N.W.2d at 194. The court placed the onus of care on the utility:

> There is a consciousness on the part of the utility with regard to the extraordinary nature of the risk that is absent among laymen. While we have no quarrel with holding the ordinary city dweller, such as plaintiffs, to the knowledge that overhead utility wires in his backyard transmit electric current, we cannot conclude, absent special knowledge or warning, that he should be expected to anticipate the presence of such a lethal charge as is contained in high-voltage transmission lines, a fact amply illustrated in the record before us.

*Id.* at 33–34, 239 N.W.2d at 194.

*Ferguson* placed a heightened duty of care on utilities, quoting from *Anderson v. Eastern Minnesota Power Co.,* 197 Minn. 144, 149, 266 N.W. 702, 704 (1936): "[w]here wires carry strong and dangerous currents of electricity a *high degree of care* must be exercised." *Id.* at 33, 239 N.W.2d at 194 (emphasis in original). The court expanded further in a footnote.

> As the risk increases so does the standard of care. Under the circumstances of this case, where high-voltage electricity is being transmitted through a resi-

dential neighborhood, the defendant must be held to a high degree of care. *Id.* n. 3. The risk is significant in a rural context, especially when 7,200 volts are carried into the farmyard where the possibility of contact with machinery or workers undertaking maintenance exists.

Appellant argues that Minn.Stat. § 326.-243 reflects the legislature's decision as to what is economical, practical and safe and therefore that balance is all that is required of utilities.

■ A safety statute setting out requirements does not constitute the final word on necessary measures. *Leisy v. Northern Pacific Railway Co.,* 230 Minn. 61, 40 N.W.2d 626 (1950), examined whether

> [r]equirements prescribed by statute, or by administrative order under statutory authorization, are specific and minimum requirements, which may satisfy the requirements of due care, but not necessarily so; and where they do not, the actor must take such additional precautions as due care may require.

*Id.* at 65, 40 N.W.2d at 629.

Under certain circumstances, the statutory minima are quite appropriate, but it is commonly a factual question.

> Where the evidence permits conflicting inferences of fact as to whether or not reasonable care required that precautions in addition to the statutory *minima* should have been taken by the railroad to satisfy the requirements of due care, the question is one of fact for the jury; but, where the evidence permits only the inference that such additional precautions were not necessary in the exercise of due care, the question is one of law for the court, and in such a case the question should not be submitted to the jury.

*Id.*

Here, respondents' presentation was adequate to place the minims in doubt; it properly was a jury question. *Leisy* demonstrates that statutory safety requirements do not define due care; due care is relative.

Appellant attempted to utilize the 1984 NESC handbook as a learned treatise under Minn.R.Evid. 803(18) to help define the terms of the 1961 NESC as to the meaning of "practicable" which was amended to "practical" in 1981. The trial court excluded the handbook on relevance grounds.

Relevancy rulings are committed to trial court discretion. In *Johnson v. William E. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820, 822 (5th Cir.1980), safety codes were admitted as treatises.

We have held that safety codes and standards are admissible when they are prepared by organizations formed for the chief purpose of promoting safety because they are inherently trustworthy and because of the expense and difficulty involved in assembling at trial those who have compiled such codes.

■ The handbook is not a code. It is a guide to the NESC by a subcommittee chairman. Although such an individual may be an expert, the handbook reflects only his opinion on the evolution of the NESC from the perspective of the last NESC revision. The trial court did not abuse its discretion.

■ Appellant argues that since Steinbrecher and Halliday advertised as experienced painters, knowledgeable in "high work," they held themselves and their services out as professional and should be judged as professionals in their knowledge of work around electrical wires. The court refused this theory and instructed that decedents were held to a "reasonable person" standard.

Appellant relies on a series of Minnesota decisions that stress the need for general professional standards and accountability.

One who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill and diligence as men in that profession ordinarily exercise under like circumstances.

*City of Eveleth v. Ruble*, 302 Minn. 249, 253, 225 N.W.2d 521, 524 (1974). A similar view was expressed in *LeSueur Creamery,*

*Inc. v. Haskon, Inc.*, 660 F.2d 342, 348, *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982) (drawing on *City of Mounds View v. Walijarvi*, 263 N.W.2d 420, 424 (Minn.1978)).

Professional persons and those engaged in any work or trade requiring special skill must possess a minimum of special knowledge and ability as well as exercise reasonable care.

Painting encompasses a wide range of practitioners from "master" painters with significant experience and training who are accorded that description by a union to college students who paint houses during the summers. Here, the decedents were teachers with several summers of painting experience. Steinbrecher's brother testified they would have had the power shut off if they had known of the unusually high voltage as they had done in the past. Testimony showed that neither Voights nor decedents had any reason to know of the 7,200 volt line running in the middle of the farmyard.

We believe that painters are too diverse a group to hold to rigid professional standards. The trial court correctly applied the *Ferguson* standard of the reasonable person:

The ordinary person * * * possessed of such knowledge of the danger of electricity as is common among laymen, is held only to a standard of *ordinary care.*

*Ferguson*, 307 Minn. at 33, 239 N.W.2d at 194 (emphasis in original).

The trial court did not err in excluding the testimony of appellant's expert in order to avoid misleading the jury on the applicable standard of care. *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980).

Under Minnesota's Wrongful Death Act, a surviving spouse is entitled to recover compensation for pecuniary loss. Minn. Stat. § 573.02, subd. 1 (1984). The language specifically limits recovery to "pecuniary loss." Because Mary Steinbrecher recovered medical expenses she incurred after her husband's death, appellant argues that a new measure of damages has been created for survivor's mental anguish and

medical expenses based on another's wrongful death.

Appellants concede that *Fussner v. Andert,* 261 Minn. 347, 113 N.W.2d 355 (1961), is the seminal case in the area. *Fussner* involved the death of the plaintiff's daughter in an automobile accident. The trial court instructed only on the financial loss suffered by the father. The supreme court agreed that grief and mental anguish should be excluded, but decided comfort should be an element of pecuniary loss:

> We agree with the plaintiff that the strict pecuniary-loss measure of damages, which limits recovery to the parent for the loss of earnings, contributions, and services in terms of dollars which the survivor might have expected to receive during the lifetime of the child, is unduly restrictive and its meaning should be expanded to conform to present-day needs and experience.

*Id.* at 352, 113 N.W.2d at 358–59.

The court stressed that children were no longer financial assets who would provide labor on the family farm or in the business. Rather,

> there is a growing appreciation of the true value to the parent of the rewards which flow from the family relationship and are manifested in acts of material aid, comfort and assistance which were once considered to be only of sentimental character.

*Id.* at 353, 113 N.W.2d at 359.

The statute was remedial by nature and so the court interpreted for the society of the time. Comfort and society were acknowledged to have pecuniary value. *Id.* Since jury decisions and awards are commonly influenced by equitable considerations, the court incorporated considerations such as comfort into pecuniary loss. *Id.* at 358–59, 113 N.W.2d at 362.

The *Fussner* court decided that

> [t]he jurors should be told that where the evidence warrants recovery the survivor may be compensated not only for actual pecuniary loss of contributions and services but should be compensated as well for loss of advice, comfort, assistance,

and protection which the jury might find to be of pecuniary value and which the survivor could reasonably have expected if the decedent had lived.

*Id.* at 359, 113 N.W.2d at 363.

Mary Steinbrecher had a disheveled life prior to her relationship and marriage to Michael, including hospitalization for drug abuse. Upon marriage to Michael, she was able to rely and lean upon him. She had a stable existence without hospitalization or psychiatric treatment. When Michael died, her life collapsed and her thought processes became bizarre. She now requires psychiatric care and has been hospitalized many times. She lost the stability Michael provided for her. All the evidence indicates that Michael was the glue that held her together. He provided Mary advice, comfort, assistance and protection. He enabled her to lead a normal life.

*Fussner* explicitly distinguished between advice and comfort, and mental anguish. Later cases refine the distinction.

*Thill v. Modern Erecting Company,* 284 Minn. 508, 170 N.W.2d 865 (1969), allowed a wife's action for loss of consortium.

> "Consortium," as a general description, represents reciprocal rights inherent in the marital relationship of husband and wife, including such undefined elements as comfort, companionship, and commitment to the needs of each other.

284 Minn. at 510, 170 N.W.2d at 867–68.

*Cummins v. Rachner,* 257 N.W.2d 808, 812 (Minn.1977), allowed the measure of pecuniary loss to consider decedent's contribution to the family.

> The court properly instructed the jury that in determining the pecuniary loss, it should consider the deceased's contributions in the past; * * * the counsel and guidance she would have given Mr. Adams; and the advice, comfort, assistance, and protection which she would have given the children if she had lived.

*Id.* at 815.

The focus is on the decedent's contributions to the marriage and family without reference to "mental anguish."

■ Existing case law subsumes the idea of "comfort" into the definition of pecuniary loss. The spectre of psychiatric testimony of survivors' mental anguish in all wrongful death actions is not the issue. The Steinbrecher facts are unique. Her background, her dependence, and her peculiar weaknesses caused a reaction to Michael's death of a totally debilitating, mental collapse rather than a "simple" grief reaction. Her medical history documents the progression of Mary's personal confusion, instability and disintegration. She must be considered for what she is, and since her situation corresponds to the case law, it should be accorded the benefit of the current definition of "pecuniary loss."

■ Appellant contends the trial should have been bifurcated with liability and damages tried separately to insulate the jury's liability verdict from sympathetic prejudice created by Mary Steinbrecher's testimony, actions and situation. The trial court has wide discretion in deciding whether or not to grant separate trials. Its ruling will not be disturbed absent a clear showing of abuse of discretion. *McGuire v. C & L Restaurant, Inc.*, 346 N.W.2d 605, 614 (Minn.1984).

The trial court decided to avoid the burden two trials would place upon Mary Steinbrecher based on medical opinion. The trial court believed it could control the risk of prejudice through warnings and instructions and it carefully did just that.

■ Appellant's counsel regularly moved for a mistrial. Although Mary Steinbrecher wept several times and once or twice made audible statements about testimony and on occasion left the courtroom, the record does not reflect prejudice requiring a new trial. A wrongful death action is not without emotion and Mary's actions in that context were not abnormal.

The matter of new trial or mistrial rests almost wholly in the discretion of the trial court and its action will not be reversed on appeal except for a clear abuse of discretion.

*Wild v. Rarig*, 302 Minn. 419, 433, 234 N.W.2d 775, 785 (1975).

The key requirement is prejudice.

If the trial court instructed the jury to disregard the improper remarks or arguments, a new trial will rarely be granted by this court.

*Id.* at 433, 234 N.W.2d at 785–86. Such instructions were given by the court.

■ The trial court properly submitted the negligence of McLeod, Steinbrecher and Halliday to the jury on one verdict form, notwithstanding the fact that neither Steinbrecher nor Halliday were parties in the others lawsuit and that McLeod had no actions pending for contribution or indemnity. In *Lines v. Ryan*, 272 N.W.2d 896 (Minn.1978), the supreme court said:

It is established without doubt that, when apportioning negligence, a jury must have the opportunity to consider the negligence of all *parties to the transaction,* whether or not they be parties to the lawsuit and whether or not they can be liable to the plaintiff or to the other tort-feasors either by operation of law or because of a prior release.

*Id.* at 902–903 (quoting *Connar v. West Shore Equipment of Milwaukee,* 68 Wis.2d 42, 44, 227 N.W.2d 660, 662 (1975)) (emphasis added).

In entering judgment, however, the trial court did not follow the well established rule in Minnesota that parties whose negligence concurs to cause an injury are jointly and severally liable. This common law doctrine has been consistently applied to the statutory scheme of comparative negligence and comparative fault. The legislature enacted the comparative negligence statute in 1969 and the comparative fault statute in 1978.

Minn.Stat. § 604.01, subd. 1 (1984), states in part:

Contributory fault shall not bar recovery in an action * * * to recover damages for fault resulting in death or in injury * * * if the contributory fault was not greater

than the fault of the person against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of fault attributable to the person recovering.

Minn.Stat. § 604.02, subd. 1 (1984), provides:

When two or more persons are jointly liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, *except that each is jointly and severally liable for the whole award.*

(Emphasis added.)

█ We appreciate the trial court's concern for the unfairness of requiring McLeod to satisfy the fault of each decedent in addition to its own fault. That determination has been made by the legislature and if it should be changed, the legislature must do it. In this case, however, the assumption that McLeod cannot be indemnified is premature because McLeod has not commenced action for contribution and indemnity against the decedents' estates. *See Hosley v. Armstrong Cork Co.*, 383 N.W.2d 289 (Minn.1986).

The trial court erred in not ordering judgment for each decedent for the full amount of the verdict less 20.8%.

## DECISION

The trial court did not err in its evidentiary rulings. The trial court did not err, under the particular facts presented here, in ruling that Mary Steinbrecher's medical expenses were the direct result of the loss of comfort from her husband and compensable as pecuniary loss. The trial court erred by reducing each plaintiff's award by the other plaintiff's fault, and we remand to enter judgment for each respondent, reduced only by 20.8%. The record supports the trial court's decisions not to grant a bifurcated trial or a mistrial.

Affirmed and remanded for entry of judgment as modified.