LEONARD LIESER, TRUSTEE FOR NEXT OF KIN OF JOHN
LIESER, v. NORTHERN STATES POWER COMPANY.
LAKE HENRY RURAL TELEPHONE COMPANY,
THIRD-PARTY DEFENDANT.

128 N. W. (2d) 292.

April 24, 1964—No. 39,088.

*Hughes, Hughes & Hughes,* for appellant.
*William G. Meyer* and *Howard I. Donohue,* for plaintiff respondent.
*Russell & Willenbring,* for third-party defendant respondent.

NELSON, JUSTICE.

This action for death by wrongful act was brought against Northern States Power Company, hereinafter referred to as the power company, following the electrocution of John Lieser. In its answer the power company denied negligence on its part and alleged that decedent's death had been caused by his own negligence and that of Lake Henry Rural Telephone Company. The power company also instituted a third-party action against the telephone company to recover any judgment it might be required to pay plaintiff.

In its answer to the third-party complaint the telephone company alleged that decedent had been its employee and that it had paid all benefits provided under the Workmen's Compensation Act; that the remedies under that act were exclusive, as provided by Minn. St. 176.031; and that no further cause of action existed against it. It also alleged that decedent's death was not caused or contribued to by negligence on its part but was caused by the negligence of the defendant power company and the contributory negligence of decedent.

After trial of both actions the issues of the negligence of the power company and the telephone company, of the contributory negligence of the decedent, and of proximate cause were submitted to the jury. It returned a verdict of $6,556 against the power company. The liability of the telephone company was submitted on interrogatories, and the jury found that it had been negligent but that its negligence was not a proximate cause of decedent's death.

The power company's subsequent motions for judgment notwithstanding the verdict and for an order changing the answer in which the jury had determined that the negligence of the telephone company was not the proximate cause of death were denied. This appeal is from the judgment thereafter entered.

The sole question presented is whether the trial court erred in failing to hold that decedent was guilty of contributory negligence as a matter of law under the circumstances disclosed by the evidence. By its only assignment of error the power company contends that he was. It argues that breach of the duty of due care amounts to contributory negligence as a matter of law, citing Peterson v. Minnesota Power & Light Co. 206 Minn. 268, 288 N. W. 588, and Beery v. Northern States Power Co. 239 Minn. 48, 57 N. W. (2d) 838. It also argues that the statutory presumption of due care in decedent's favor does not preclude a finding of contributory negligence as a matter of law, citing Roeck v. Halvorson, 254 Minn. 394, 95 N. W. (2d) 172.

It appears that from 1950 on the power company has authorized the telephone company to affix its wires to the poles of the power company's transmission lines. In the fall of 1958, one Omar Fischbach moved to a farm in Lake Henry township and then obtained a tele-

phone connection from the telephone company. Through the permission of the power company the telephone lines were attached to a utility pole which had previously been installed by the power company near the driveway of the farm. Two of the telephone wires were located at points below the transformer on the utility pole and the drop line providing telephone service to the residence was attached at a point above the transformer. Those lines were installed by Ovide Fischbach, Omar's father, a regular part-time employee of the telephone company, with the aid of decedent, also a part-time employee.

Late in August 1959 some employees of the power company informed Omar Fischbach that the telephone wires had to be taken down from the utility pole within a certain time and that if they were not, the power company would make a cutoff. They asked him to so inform his father, which he did. Thereafter, on September 7, 1959, Ovide Fischbach, Roman Lieser, also an employee of the telephone company, and decedent, in response to the power company's demand, installed a telephone pole some distance from the power company's utility pole.

After the telephone pole was installed, the decedent put stretchers on the two primary telephone wires, attached them to the new pole, and cut the wires. After he had cut the wires, there were two lengths of wire, 6 or 7 feet long, no longer forming a part of the telephone line but still attached to the utility pole. The transformer was affixed to the utility pole on one side, and the other side of the pole contained certain attachments including the telephone wires and two cut out switches which contained fuses. The bottom of the transformer was located 15 feet above the ground. One of the two wires of the telephone line affixed to the pole on the side opposite the transformer was attached at a point 15 inches below the transformer, or 13 feet 9 inches above the ground, and the lower of the two telephone wires was attached at a point 27 inches below the transformer or 12 feet 9 inches above the ground.

In order to remove the two telephone wires and the so-called drop line, decedent was required to climb the power company's pole. It was while moving upward on said pole to effect the wire removals that the decedent was electrocuted. Ovide Fischbach had gone over to his auto-

mobile to get some materials to splice the new drop wire and did not see what actually took place. In describing the accident he testified:

"A.   Then he climbed up and he started taking these off.

"Q.   That is, he took them out where they had been clamped on, is that it?

"A.   Yes, the dead ends.

\* \* \* \* \*

"A.   I think he must have hit that with his safety belt and that went onto this cutout.

"Q.   The fuse box?

"A.   Yes.

\* \* \* \* \*

"The Witness: I said he left one [wire] on. He must have climbed higher, and then the safety belt must have hit this wire, and it must have threw this up and it hit this cutout switch.

\* \* \* \* \*

"A.   Well, I didn't see no sparks at John. I just seen it on that cutout switch where the wire hit.

\* \* \* \* \*

"A.   For a split second or so his hooks let loose of the pole and his belt slipped, and it just hooked on one of those dead ends.

\* \* \* \* \*

"A.   That's one of those brackets on the pole.

"Q.   The bracket that held the wire?

"A.   Yes."

While Ovide Fischbach testified that decedent was below the transformer, or at least that his belt was, he was unable to fix his exact location on the pole when the accident occurred. Witness Roman Lieser, the only other witness present, testified as follows:

"Q.   After the telephone pole was in place, what was done?

"A.   Well, Johnny went up, you know; Johnny Lieser went up and he put the other wires on, the main line wires, and put a stretcher on the wires, and cut them.

\* \* \* \* \*

"Q. And is it a fact that after that he cut the two wires that were attached to the utility pole?

"A. Yes, sir.

\* \* \* \* \*

"Q. After that was done, what was the next thing that was done?

"A. Well, then he come down and he come on the Northern States post, and he left one of them wires down, and he was going up and getting that lead-in wire down, and he left one piece hang down, you know, and he sort of got tangled in there; with his belt he sort of pushed that up a little bit, or what happened. It went so fast I don't know. Then it went up on that cutout switch, you know, and—

"Q. I see. That is, he removed one of these lower wires?

"A. Yes, sir.

"Q. And as he was climbing the pole, the wire that had been cut came in contact with his belt or something on his person, is that correct?

"A. Yes, sir.

"Q. And it came in contact in some way with the cutout switch?

"A. Yes, sir.

"Q. And that's the cutout switch on the crossarm holding the transformer, is that right?

"A. That's right.

\* \* \* \* \*

"Q. And what happened to John when that occurred?

"A. Well, he just sort of froze, or it just grabbed him, and then it took about half a minute or a minute and then he just dropped down and he was dead, you know."

The power company assumes, without reliable support in the testimony, that the height of decedent's body from his waist up was above the point where the second telephone wire was attached to the pole and that he was therefore in a position in which he could have removed the wire. On these assumptions it contends that he was contributorily negligent in having failed to do so. It also assumes that as decedent climbed the pole to disengage the telephone service line, the belt affixed around both his body and the pole hit the stub end of the tele-

phone wire still attached to the pole and caused that "springy," tense wire to spring up and strike the cutout switch, completing a circuit which transmitted 7,200 volts of electricity through his body. The power company admits that the wires carrying this amount of voltage to the transformer were not insulated.

There is no direct evidence to support the power company's contentions concerning how the accident happened. There is no testimony as to the position decedent had attained on the pole when he first removed the lower of the two wires, nor as to the manner in which he removed the first wire. There is no showing whether decedent reached out and above him to remove the wire or whether he removed it when opposite the point at which the wire was affixed. There is no testimony to show that he had proceeded farther up on the pole after removing the first wire. Ovide Fischbach testified that he "must have climbed higher," but he did not know. Roman Lieser could only say:

"* * * he sort of got tangled in there; with his belt he sort of pushed that up a little bit, or what happened. It went so fast I don't know, then it went up on that cutout switch, you know * * *."

It does appear that in falling, decedent's body caught on one of the brackets which had held the telephone wires, but there is no testimony as to how far he fell. Ovide Fischbach, in attempting to describe what happened, said:

"For a split second or so his hooks let loose of the pole and his belt slipped, and it just hooked on one of those dead ends."

The employees of the power company, Ralph Gorecki and Claude Harnit, who had demanded removal of the telephone wires from the company's utility pole testified that their employment by the power company covered a period of about 11 years, their duties consisting of maintenance, repairing lines, changing transformers, and doing other work assigned to the three-man crew of which they were members. Their testimony indicates that the power company's lines had extended for some years prior to 1959 from the village of Paynesville through the township of Lake Henry, in which the Omar Fischbach farm is located.

The pole in question here was 30 feet high. Three lines necessary for the transmission of electrical energy were strung on an alley arm near its top and fixed in place by means of insulators. Some distance below the alley arm was a crossarm, centered on the pole and extending in both directions from it. On each end of the crossarm was the cutout switch containing a fuse. A wire extended from the primary transmission lines to each cutout switch, first passing through an insulator on the crossarm to the outside of the switch, through the switch, and then, on the opposite side of the switch, to a transformer below the crossarm. These wires, referred to as riser wires, are affixed to the primary lines, being brought together and held in place by the use of a hot clamp. Electrical energy is carried from the primary lines to the riser wires through a connection on the clamp, and by the riser wires to the transformer. The riser wire on this type of power line will carry the same voltage—6,900 to 7,200—as the primary transmission lines. The voltage is reduced by means of windings in the transformer and the electrical energy serving the customer is transmitted from it by a so-called service line consisting of two wires each carrying 120 volts and one neutral wire. The result is commonly called 240 volts.

The purpose of the cutout switches is the protection of the transformer. Each cutout switch contains a fuse which can be taken out by a wooden tool known as a "hot stick." The cutout switches can be deenergized in this manner or by removing their doors. The hot stick is also used to disconnect the riser wires from the primary transmission lines.

The primary telephone wires had been affixed to the pole at points 15 inches and 27 inches below the transformer, run along the back of the pole to a point 18 inches above the transformer, and there connected to a drop line extending to the farmhouse. The power company's employees testified that the clearance from a transformer to a conductor, such as a telephone drop line, should be at least 40 inches and that the conductor should be placed below the transformer and never between the transformer and the primary power lines. Mr. Gorecki said that when he told Omar Fischbach to have the telephone

wires removed he said that they should be placed below the transformer and that that would mean 40 inches below.

Both employees of the power company admitted that a hazardous condition will result if a telephone line or other conductor is placed between the transformer and the primary power line. When they were called to the farm because of power failures in August 1959 and observed the location of the telephone drop line, they recognized that the condition was hazardous and that there was imminent danger of injury to any person climbing the pole to a point near or above the transformer. Both employees admitted that the riser wires, although coated with weatherproofing, were not insulated and were, for all practical purposes, bare wires.

On each occasion the employees were called to the farm, Gorecki replaced fuses in the cutout switches after first removing their doors. He did not deenergize the riser lines extending from the primary lines to the cutout switches on either occasion, but he did not work above the transformer. On the second occasion the employees talked to Omar Fischbach and asked him to tell his father or someone with the telephone company to remove the telephone wires from the pole. Their testimony establishes that they then knew that to attempt removal of the telephone wires would mean imminent danger to any person climbing the pole to a point opposite the transformer or above it if the power lines were not first deenergized. Both said that the procedure required to deenergize the riser wires leading to the transformer was relatively simple and could be accomplished within a 5-minute period. They testified that it was the policy of the power company not to permit anyone other than its employees to deenergize its lines. Neither employee knew whether the telephone company's employees used hot sticks in their work and had never made inquiry as to whether or not the telephone company employees had any means of deenergizing the wires.

While the power company apparently concedes that it was negligent, it nevertheless maintains that the record conclusively establishes the contributory negligence of decedent as a matter of law.

In Fitch v. City of Blue Earth, 180 Minn. 125, 230 N. W. 469, plain-

tiff recovered a verdict for a death through electrocution, but defendant's motion for judgment notwithstanding the verdict was granted. Upon appeal, however, this court reversed. In discussing the question whether decedent had been contributorily negligent, the court said (180 Minn. 129, 230 N. W. 471):

"It is not shown that decedent had any notice or knowledge of the fact that the house wires carried an excessive current. There is the presumption that he exercised ordinary care. That presumption however is a rule of proof and has no special application if all the facts and circumstances surrounding the accident are shown and undisputed. In the present case no one saw the accident. How it happened must be gathered, if it can be done, from the circumstances and situation shown. Circumstantial evidence may be, but is not ordinarily, conclusive. Ordinarily such evidence presents a question of fact for the jury or trier of facts. We are dealing with electricity, a silent and unseen force. Neither sight nor hearing could detect it. * * *

&ast; &ast; &ast; &ast; &ast;

"The defendant seeks to apply the rule that one who voluntarily subjects himself to a known danger is guilty of contributory negligence, although he does not fully appreciate the precise nature of the danger or anticipate the seriousness of the injury likely to follow; that it is sufficient if he knows in a general way that serious injury is likely to result. Our attention has not been called to any case in this state clearly defining or applying this rule. It is not in entire harmony with our line of cases holding that the mere fact that a person subjects himself to some danger is not conclusive evidence of contributory negligence. [Citations omitted.] We take it that the rule, that one who voluntarily subjects himself to some degree of known danger is guilty of contributory negligence if injury follows, is not unyielding. The duty involved is that of exercising ordinary care. The rule of ordinary care, with all its incidents, is the primary and controlling rule. The other facts and circumstances surrounding the accident must be taken into consideration and may be and often are such as to make it a question of fact. The degree of known danger, the known certainty or probability of serious injury, and other facts and circumstances, must be considered."

The presumption of due care referred to above is embodied in Minn. St. 602.04, which states:

"In any action to recover damages for negligently causing the death of a person, it shall be presumed that any person whose death resulted from the occurrence giving rise to the action was, at the time of the commission of the alleged negligent act or acts, in the exercise of due care for his own safety. The jury shall be instructed of the existence of such presumption, and shall determine whether the presumption is rebutted by the evidence in the action."

We held in Behrendt v. Ahlstrand, 264 Minn. 10, 118 N. W. (2d) 27, that the rule that one who voluntarily submits himself to some degree of danger is guilty of contributory negligence if injury follows is not unyielding, the rule of ordinary care with all its incidents being the primary and controlling rule. This is true, even in the face of the rule that the power company is not an insurer of the safety of those who come in contact with its premises or equipment and has a duty only to exercise reasonable care, commensurate with the circumstances, for their protection.

■ In Theisen v. Minnesota Power & Light Co. 200 Minn. 515, 274 N. W. 617, the plaintiff's decedent was killed by an electrical discharge from electric wires while attaching a neon sign to a pole of the defendant village which had been installed to support a street lamp, the pole being directly beneath high-tension wires of a power line. The verdict in plaintiff's favor was affirmed on appeal, the court holding that "[c]ontributory negligence is not established merely by showing that the deceased worked in a place of danger, it being necessary to show that his conduct was negligent in the face of the danger, which is a question for the jury."

■ In Schroepfer v. City of Sleepy Eye, 215 Minn. 525, 10 N. W. (2d) 398, decedent was employed in an elevator at Sleepy Eye, performing miscellaneous work. On July 9, 1941, at the end of his day's work of painting the exterior of the elevator, while he was on the roof of a lean-to shed on the south side of the elevator, he was electrocuted by taking hold of a wire connection and the brace of a crossarm. In that case the court said (215 Minn. 528, 10 N. W. [2d] 401):

"A distributor of electricity, because it is a dangerous, deadly, and silent force, is under an affirmative duty either to insulate its wires or to place them beyond the danger line of contact where people might reasonably be expected to go. The rule is but a concrete application of the general one in negligence cases, that a person is under a legal duty to exercise due care to avoid harm reasonably to be apprehended. * * *

\* \* \* \* \*

"The decisive question here is whether or not there was any reasonable cause to anticipate that people might come in dangerous proximity to the partly uninsulated connection on the crossarm. This was a fact question. * * *

\* \* \* \* \*

"* * * We think that the evidence permits a finding that decedent knew that the wires were dangerous; that he had no reason to believe that they were partly uninsulated; and that it wholly fails to show what he did except to walk on the roof toward the crossarm. True, decedent had been warned and knew that the wires were dangerous. But that in itself is not sufficient to charge him with contributory negligence. To charge a person with contributory negligence, warnings and knowledge of danger must extend to the particular danger causing the injury. Theisen v. Minnesota P. & L. Co. 200 Minn. 515, 274 N. W. 617. Here, the warnings and knowledge went only to the known and obvious dangers incident to contact with the high-tension wires, but not to those incident to the partly uninsulated connection. There is no evidence that decedent was aware of that particular danger. The presumption is that he exercised due care for his own safety. For lack of proof as to what he did other than to walk toward the crossarm, there was failure of proof to displace the presumption of due care on his part. 'The presumption of due care does not vanish in the absence of evidence showing the conduct of the deceased.' Lee v. Zaske, 213 Minn. 244, 248, 6 N. W. (2d) 793, 795. An inference that decedent exercised due care and was not guilty of contributory negligence was permissible. The question was one of fact for the jury. [Citations omitted.]"

■ We have said that although knowledge of exposure to danger

is a factor bearing upon the issue of contributory negligence, it is not necessarily sufficient of itself to establish contributory negligence as a matter of law without regard to surrounding circumstances. The weight of contradicted and conflicting evidence and the credibility of witnesses are always questions for the jury to determine. The issue of whether contributory negligence exists is a question of law only where the facts are such that all reasonable men must draw the same conclusion from them. It is necessary here to distinguish between assumption of risk and contributory negligence. The former involves comprehension that a peril is to be encountered and a willingness to encounter it, differing from contributory negligence—which is based on carelessness—by being an exercise of intelligent choice. See, Zuercher v. Northern Jobbing Co. 243 Minn. 166, 66 N. W. (2d) 892; 13B Dunnell, Dig. (3 ed.) § 7023, and cases cited under note 28; Mayzlik v. Lansing Elev. Co. 241 Minn. 468, 63 N. W. (2d) 380; Trimbo v. Minnesota Valley Natural Gas Co. 260 Minn. 386, 110 N. W. (2d) 168.

In Arkansas-Missouri Power Co. v. Davis, 222 Ark. 686, 262 S. W. (2d) 916, an employee of a company which prepared advertisements on outdoor signboards was injured when he allowed a ladder to come in contact with a 33,000-volt power line maintained by the power company near a signboard on which he was about to change the sign. The line had been constructed in 1936 and the signboard in 1946. Engineers, as experts, testified that allowing the line to remain at such proximity to the signboard was not in accordance with recognized safety measures for the industry. The court in affirming a verdict in favor of the employee held that the issue of the power company's negligence was properly submitted to the jury, the power company having a continuing duty to use a high degree of care in maintaining electrical wires over which high voltage is conveyed and to exercise due care in the inspection of its poles, wires, transformers, and other appliances. The court also held, upon evidence that employees of the advertising company had worked on the signboard numerous times without mishap over a 5-year period, that contributory negligence of the employee was properly submitted to the jury. See, also, Lebow v. Missouri Public Service Co. (Mo.) 270 S. W. (2d) 713.

In Foster v. Herbison Const. Co. 263 Minn. 63, 66, 115 N. W. (2d) 915, 917, we said:

"It is, of course, elementary that ordinarily the question of plaintiff's contributory negligence is for the jury. We have frequently held that before we can hold that plaintiff's contributory negligence appears as a matter of law the evidence must be so conclusive as to leave no room for differences of opinion among reasonable persons. If, from the evidence, different inferences may reasonably be drawn, it is for the jury to decide which inference to draw."

In City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 122 A. L. R. 637, the death of the plaintiff's intestate was alleged to have resulted from the negligence of the municipality in operating an electric light and power plant. The Alabama court in the course of its opinion said (188 So. 267, 122 A. L. R. 642):

"When one without special knowledge of all the elements of danger is sent to do a job inherently dangerous, he should not be merely warned of danger, but should be instructed in all the elements of danger. He is not to be charged with contributory negligence, if he is exercising reasonable care so far as things appear to him. He must appreciate, or be derelict in not appreciating, the dangers incident to the situation, and act in disregard of his own safety. In such cases the question of contributory negligence is generally one for the jury, rarely one of law."

We fail to find any evidence which establishes conclusively that decedent was possessed of knowledge of the danger which caused his death. Nor does the record disclose any other evidence relative to his alleged contributory negligence so conclusive as to rebut the presumption of due care as a matter of law. As the trial court in the memorandum made part of its post-trial order said—

"* * * [t]he evidence as to decedent's location, and movements, on the pole, is not so complete and clear as to forbid all reasonable dispute."

In analyzing the evidence it is to be borne in mind that contributory

negligence on the part of the decedent is not established merely by showing that he worked in a place of known danger. It must be shown also that his conduct was negligent in the face of the danger. In other words, the basic test is whether the decedent acted as a reasonably prudent man under the circumstances. Beery v. Northern States Power Co. 239 Minn. 48, 57 N. W. (2d) 838.

While the power company contends that it was entitled to a directed verdict, we think the trial court properly denied it under the rule stated in Lee v. Smith, 253 Minn. 401, 403, 92 N. W. (2d) 117, 120:

"A motion for a directed verdict, which by its very nature accepts the view of the entire evidence most favorable to the adverse party and admits the credibility (except in extreme cases) of the evidence in his favor and all reasonable inferences to be drawn therefrom, should be granted only in those unequivocal cases where, in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, or where it would be contrary to the law applicable to the case."

■ We have repeatedly said that a motion for judgment notwithstanding the verdict also accepts the view of the evidence most favorable to the verdict and admits every inference reasonably to be drawn from such evidence as well as the credibility of the testimony for the adverse party. If the application of this rule in the light of the evidence as a whole discloses a reasonable basis for the verdict, the motion will be denied. Mayzlik v. Lansing Elev. Co. *supra*; 10 Dunnell, Dig. (3 ed.) § 5082.

We conclude that the alleged contributory negligence of plaintiff's decedent was properly submitted as a jury issue and that the general verdict in favor of plaintiff against the power company is, upon the record herein, entitled to affirmance.

Affirmed.