SCOTT FERGUSON, A MINOR, BY DAVID L. FERGUSON, HIS FATHER AND NATURAL GUARDIAN, AND ANOTHER v. NORTHERN STATES POWER COMPANY.

239 N. W. 2d 190.

January 16, 1976—No. 44671.

---

*Rischmiller & Wasche* and *Robert Wm. Rischmiller,* for appellants.

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson II, Mary Jeanne Coyne,* and *R. Gregory Stephens,* for respondent.

*Gordon W. Shumaker* and *Joseph T. Burkard,* for Minnesota Trial Lawyers Assn., amicus curiae, seeking reversal.

*Pollock, Pollock & Fay, Edward I. Pollock,* and *Edward J. Kionka,* for The Association of Trial Lawyers of America, amicus curiae, seeking reversal.

*Lindquist & Vennum, Maclay R. Hyde,* and *Harry C. Piper III,* for Minnesota Municipal Utilities Assn., Inc., amicus curiae, seeking affirmance.

*LeVander, Gillen, Miller & Magnuson* and *Harold LeVander, Jr.,* for Minnesota Assn. of Electric Cooperatives, amicus curiae, seeking affirmance.

*Field, Arvesen, Donoho, Lundeen & Hoff* and *Cyrus A. Field,* for Otter Tail Power Company; *Springer, Carstedt & Kurlander* and *William D. Carstedt,* for Interstate Power Company; and *Hanft, Fride, O'Brien & Harries* and *William P. O'Brien,* for Minnesota Power & Light Co., amici curiae, seeking affirmance.

Heard before Sheran, C. J., and Otis, Kelly, and Todd, JJ., and reheard and decided by the court en banc.

YETKA, JUSTICE.

This appeal arises out of an action in Hennepin County District Court to recover damages for injuries sustained by plaintiff Scott Ferguson as a result of coming in contact with a tree branch which fell upon an uninsulated 8,000-volt power line while Scott was trimming trees in the backyard of his suburban-Minneapolis home, and consequential damages sustained by his father, plaintiff David L. Ferguson. The power line was owned and maintained by the defendant, Northern States Power Company (NSP). The case was tried before a jury, which returned a special verdict finding all parties causally negligent and assessing plaintiffs' negligence in excess of 50 percent. Judgment was ordered for defendant, and plaintiffs' motion for judgment n.o.v. or a new trial was denied. We reverse.

The 8,000-volt transmission line was one of four power lines located at the rear of plaintiffs' residential lot. It was strung approximately 5 to 7 feet above the other lines, which were service lines which carried ordinary household current, and a total distance of 28 feet above the ground at the point where the accident occurred. The photographs admitted in evidence show that the power lines crossing plaintiffs' backyard pass through several trees.

The lines were installed in September 1955. Although the poles from which these lines are hung were located within the 5-foot utility easement at the rear of plaintiffs' lot, the lines themselves actually encroach upon plaintiffs' lot up to a distance of 5 feet at the point where the accident occurred.

In 1964 plaintiff David Ferguson planted seven poplar trees along the eastern edge of his lot. One of these trees was located 2 ½ feet north of the encroaching power lines. As these rapidly-growing trees matured, plaintiffs cut them back several times prior to the accident.

In the spring of 1971 David Ferguson determined that the poplar trees required trimming in order to assure proper growth. At that time the tree nearest the power lines was approximately 35 to 40 feet tall. After receiving a cost estimate of $150 from a professional tree trimmer, plaintiffs decided to do the job themselves. At no time prior to the accident did plaintiffs contact NSP regarding the proximity of the power lines to the poplar tree.

In trimming the poplar tree nearest the lines, plaintiffs propped a 24-foot aluminum extension ladder against the tree, secured at the top with a piece of rope. Before climbing the ladder, Scott and his father discussed the overhead electric wires:

"Q. * * * I will ask you what did you say to Scott?

"A. I said to Scott, 'The lower wire I am sure is the telephone wire, and that is no concern. The next three wires are like those that we work around when we paint the house. I am sure they are insulated, but stay away from them anyway. The top wire, I don't know what that is. It looks like it may be a support wire, but you will be below that regardless, so you don't need to worry about it.' "

On cross-examination David Ferguson again testified that he did not know the nature of the primary transmission line:

"Q. And of course you knew that there was electricity in some of these wires?

"A. I knew that there was electricity in the three wires.

"Q. How did you know there was electricity in the three wires?

"A. Because I am accustomed to seeing those coming into my house, working around them when I paint the house. I know that those are the wires that feed the electricity to my house.

\* \* \* \* \*

"Q. You did not know what the top wire carried, if anything?

"A. No.

\* \* \* \* \*

"Q. \* \* \* Counsel asked if you saw any warning signs on any of these poles. You did not, did you?

"A. No, I did not.

"Q. You didn't need any warning signs on those poles to tell you that there was electricity in the three lines, did you?

"A. No, because I am accustomed to seeing warning signs of poles where there is high voltage."

It is clear from that record that while Scott and his father were aware that three of the lines carried household current, they were not aware that the uppermost line transmitted 8,000 volts and was uninsulated.

Scott climbed the ladder to a height of 21 feet and began sawing branches. No consideration was given to the danger of branches falling upon the wires, but rather where and how the branches fell to the ground was left to chance. The record does not disclose exactly how Scott came in contact with the electric current. However, it appears that the accident occurred as a result of a falling branch becoming caught on the 8,000-volt primary line.[1]

---

[1] Defendant's "troublemen" were at the scene shortly after the accident, at which time they dislodged a burning branch hanging from the *primary* line down to the secondary lines. The electricity was "arcing" (flowing) from the branch onto the secondary lines. They also discovered burn marks in the ground at the foot of the ladder, and found a small bow saw on the ground nearby with burn marks on the blade.

The case was submitted to the jury on two theories of liability —trespass and negligence. The jury rejected trespass liability, apparently on the theory that plaintiffs had impliedly consented to the encroachment. Scott and his father were both found to be causally negligent by unanimous verdict of the jury, but only 10 of the 12 members of the jury found NSP to be causally negligent. Separate questions were submitted to the jury for apportioning causal negligence, first, as between David Ferguson and NSP and, second, as between Scott Ferguson and NSP. The jury's answers were unanimous. It found David Ferguson 75 percent causally negligent and NSP 25 percent, and Scott Ferguson 70 percent and NSP 30 percent. The jury found that neither Scott nor his father had assumed the risk. Damages for David Ferguson for medical expenses were $28,952.89, an amount agreed to by the parties, and for Scott Ferguson $250,000, a finding of five-sixths of the jury.

The decision of this case has been unusually troublesome for the court. The difficulty, we believe, lies in the enormity of the risk involved in the transmission of high-voltage electricity through residential neighborhoods, and the apparent lack of awareness of the extent of the danger on the part of those living there. The following comment of the Utah Supreme Court portrays the problem:

"A high tension transmission wire is one of the most dangerous things known to man. Not only is the current deadly, but the danger is hidden away in an innocent-looking wire ready at all times to kill or injure anyone who touches it or comes too near to it. For the average citizen there is no way of knowing whether the wire is harmless or lethal until it is too late to do anything about it." Brigham v. Moon Lake Elec. Assn. 24 Utah 2d 292, 294, 470 P. 2d 393, 395 (1970).

We considered the risk so unusual that we requested further argument, both from the parties and amici curiae, on whether

the maintenance of an uninsulated high-voltage transmission line constitutes an "abnormally dangerous activity," thereby subjecting the owner of the line to strict liability for harm caused another as a result of coming in contact with the line.[2] When the proposed Restatement sections quoted in footnote 2 below are applied to the circumstances of this case, a convincing argument can be made for holding the utility strictly liable. Moreover, spreading the cost of serious injury over all consumers of electricity is equitably more appealing. However, the court is persuaded by the amicus briefs which detail the severe economic consequences which may be sustained by the many small electric utilities in the state by the abrupt imposition of such a rule. We therefore decline to decide this issue at this time; however, we do call this matter to the attention of the legislature which is better equipped to resolve economic problems of this nature.

While we decline to impose strict liability in this case, we

---

[2] Restatement, Torts 2d, Tent. Draft No. 10 (1964), provides:

§ 519. GENERAL PRINCIPLE

"(1) ONE WHO CARRIES ON AN ABNORMALLY DANGEROUS ACTIVITY IS SUBJECT TO LIABILITY FOR HARM TO THE PERSON, LAND OR CHATTELS OF ANOTHER RESULTING FROM THE ACTIVITY, ALTHOUGH HE HAS EXERCISED THE UTMOST CARE TO PREVENT SUCH HARM.

"(2) SUCH STRICT LIABILITY IS LIMITED TO THE KIND OF HARM, THE RISK OF WHICH MAKES THE ACTIVITY ABNORMALLY DANGEROUS."

§ 520. ABNORMALLY DANGEROUS ACTIVITIES

"IN DETERMINING WHETHER AN ACTIVITY IS ABNORMALLY DANGEROUS, THE FOLLOWING FACTORS ARE TO BE CONSIDERED:

(a) WHETHER THE ACTIVITY INVOLVES A HIGH DEGREE OF RISK OF SOME HARM TO THE PERSON, LAND OR CHATTELS OF OTHERS;

(b) WHETHER THE GRAVITY OF THE HARM WHICH MAY RESULT FROM IT IS LIKELY TO BE GREAT;

(c) WHETHER THE RISK CANNOT BE ELIMINATED BY THE EXERCISE OF REASONABLE CARE;

(d) WHETHER THE ACTIVITY IS NOT A MATTER OF COMMON USAGE;

(e) WHETHER THE ACTIVITY IS INAPPROPRIATE TO THE PLACE WHERE IT IS CARRIED ON; AND

(f) THE VALUE OF THE ACTIVITY TO THE COMMUNITY."

nevertheless are unable to affirm the judgment of the trial court. The problem lies in the issue of comparative negligence. In light of the relative risks involved, we have serious doubts about the reasonableness of the jury's apportionment of causal negligence.

As we observed earlier in this opinion, the transmission of high-voltage electricity is a highly dangerous activity, and presents the risk of unusually serious harm to those who may come in contact with such a transmission wire. In Anderson v. Eastern Minn. Power Co. 197 Minn. 144, 149, 266 N. W. 702, 704 (1936), we stated that "[w]here wires carry strong and dangerous currents of electricity a *high degree of care* must be exercised." [3] (Italics supplied.) This is a standard consistent with that applied in other jurisdictions. Annotation, 69 A. L. R. 2d 9, 15; 26 Am. Jur. 2d, Electricity, Gas, and Steam § 42. The ordinary person, however, possessed of such knowledge of the danger of electricity as is common among laymen, is held only to a standard of *ordinary care.* [4]

The different standards are grounded in common sense. There is a consciousness on the part of the utility with regard to the extraordinary nature of the risk that is absent among laymen. While we have no quarrel with holding the ordinary city dweller, such as plaintiffs, to the knowledge that overhead utility wires in his backyard transmit electric current, we cannot conclude, absent special knowledge or warning, that he should be expected to anticipate the presence of such a lethal charge as is contained

---

[3] The duty imposed on electric companies is often expressed as requiring the exercise of care "commensurate with the peril reasonably to be apprehended to those who may have occasion to come in proximity to [its power lines]." Anderson v. Northern States Power Co. 236 Minn. 196, 200, 52 N. W. 2d 434, 438 (1952). See, also, Bunten v. Eastern Minn. Power Co. 178 Minn. 604, 228 N. W. 332 (1929). As the risk increases so does the standard of care. Under the circumstances of this case, where high-voltage electricity is being transmitted through a residential neighborhood, the defendant must be held to a high degree of care.

[4] Lieser v. Northern States Power Co. 268 Minn. 95, 128 N. W. 2d 292 (1964).

in high-voltage transmission lines, a fact amply illustrated in the record before us.

Thus, it seems to us that in order to establish that Scott Ferguson was contributorily negligent, not only must defendant prove that Scott was working in a place of danger, but also that his conduct was negligent in the face of the danger. Lieser v. Northern States Power Co. 268 Minn. 95, 128 N. W. 2d 292 (1964).[5]

Because of the comparatively greater knowledge possessed by a utility of the extraordinary magnitude of the risk involved in the transmission of high-voltage electricity through residential neighborhoods, the risk to which it subjects the ordinary city dweller is not the equivalent of the risk the residential user subjects himself to by coming in close proximity to the overhead wires. The risks are different in degree. While we cannot hold that they are so different as to be an absolute bar to the defense of contributory negligence,[6] we do rule that in a case such as this, involving a dangerous instrumentality and a great disparity in risks, the jury, in order to fairly and accurately apportion causal negligence, should be instructed to give special consideration to this disparity.

We are not unmindful of a court's reluctance to interfere with the jury's findings and apportionment of negligence. Riley v. Lake, 295 Minn. 43, 203 N. W. 2d 331 (1972); Martin v. Bussert, 292 Minn. 29, 193 N. W. 2d 134 (1971). If our doubts as to the finding of contributory negligence and the reasonableness of the apportionment of causal negligence in this case were the only grounds for interfering with the jury's apportionment, we would be very hesitant to do so. But they are not. Certain other ir-

---

[5] The record contains uncontroverted evidence that Scott Ferguson did not touch the primary wire with either his bare hand or the saw because the youth was at least *6 feet* below that wire when the accident occurred.

[6] See, Phelps v. Magnavox Co. of Tennessee, Inc. 466 S. W. 2d 226 (Tenn. App. 1970), where that court recognized that the conduct of an electric company may have constituted gross and wanton negligence to which the defense of contributory negligence will not bar recovery.

regularities in the jury's consideration of the comparative negligence issue, when taken together with the apparent unreasonableness of their verdict, lead us to the conclusion that the plaintiffs have been denied a fair trial on the issue of liability. Schwartz v. Minneapolis Suburban Bus Co. 258 Minn. 325, 104 N. W. 2d 301 (1960).

The first, and the most serious, is the manner in which the issue was submitted. The jury was instructed to apportion the causal negligence between the defendant and each plaintiff individually. The form of the special verdict and the answers of the jury follows:

"QUESTION 9: * * * taking all of the negligence which contributed to the incident at 100%, what percentage or proportion thereof do you attribute to:

    (a)   Northern States Power Company?   25%

    (b)   David L. Ferguson?   <u>75%</u>

"QUESTION 10: * * * taking all of the negligence which contributed to the incident at 100%, what percentage or proportion thereof do you attribute to:

    (a)   Northern States Power Company?   30%

    (b)   Scott Ferguson?   <u>70%</u>"

This is not consistent with our comparative negligence statute and can lead to an erroneous result. In Winge v. Minnesota Transfer Ry. Co. 294 Minn. 399, 403, 201 N. W. 2d 259, 263 (1972), we set forth the function of the comparative negligence statute:

"* * * Our comparative negligence statute, Minn. St. 604.01, which exempts no class of litigants from its application, now requires a comparison of relative fault. While the statute speaks of a comparison of negligence, in application what is really compared, upon a consideration of all relevant facts and circumstances, is the relative contribution of each party's negligence to the damage in a causal sense."

In this case the jury determined that NSP, Scott Ferguson, and

David Ferguson were all causally negligent, each contributing to the accident in which Scott was injured.[7] In order to reach a proper result, consistent with our statement in Winge, the jury should have apportioned all of the causal negligence, assuming that to be 100 percent, among those parties the jury had determined, by their previous answers, to have contributed to the accident. In this case one question should have been submitted requiring apportionment of causal negligence among NSP, Scott, and his father.[8]

The second irregularity is the participation in the apportionment-of-negligence question by the two jurors who dissented from the finding that the defendant was causally negligent.

While we have not had occasion to consider this issue before, our neighboring state of Wisconsin, from which we adopted our comparative negligence statute, has. The Wisconsin Supreme Court has held that jurors who dissent from a finding of causal negligence are disqualified from participating in the comparative-negligence question. Fleischhacker v. State Farm Mutual Auto. Ins. Co. 274 Wis. 215, 79 N. W. 2d 817 (1956).[9]

---

[7] While David Ferguson's action for medical expenses was derivative of his son's injuries, his negligence was not. His negligence was active, apparently submitted on a theory of a property owner's liability.

[8] This case is not the same as the situation presented in Vroman v. Kempke, 34 Wis. 2d 680, 150 N. W. 2d 423 (1967), where it was held improper to include the negligence of the two plaintiffs in the same comparative negligence question with the defendant. In that case the negligence of each plaintiff was passive, not active, and did not contribute to the other's injuries.

[9] In Fleischhacker, two jurors dissented from a finding of defendant's negligence and two other jurors dissented from a finding of plaintiff's contributory negligence. The disqualification of those four jurors from participating in the apportionment question resulted in less than five-sixths of the jurors remaining so that a five-sixths verdict could not be returned. We recognize that in this case 10 jurors, who concurred in all findings of causal negligence, remain. Nevertheless, in the give and take of jury deliberations, the participation of two jurors inclined to attribute only minimal negligence to NSP would appear to be prejudicial to the plaintiffs.

While it is true that the Wisconsin statute authorizing the return of a five-sixths verdict expressly provides that "[i]f more than one question must be answered to arrive at a verdict on the same cause of action, the same five-sixths of the jurors must agree on all such questions," Wis. Stat. 270.25(1), the absence of that provision in our statute, Minn. St. 546.17, does not necessarily mandate a different rule.

The questions regarding the causal negligence of the parties and the apportionment of that causal negligence are not independent of one another, but are integrally related in determining ultimate liability. To illustrate, the question of apportionment is never reached, in the ordinary case, until one plaintiff and one defendant are found to be causally negligent. And when reached, its function is to give further definition to causal negligence for purposes of imposing liability. It is unlike the damages question which can be, and is,[10] answered independently of liability. Cf. Juvland v. Mattson, 289 Minn. 365, 184 N. W. 2d 423 (1971) (apportionment issue cannot be retried independently of causal negligence); and Koenigs v. Werner, 263 Minn. 80, 116 N. W. 2d 73 (1962) (concurring opinion) (cause and negligence cannot be bifurcated for new trial).

We therefore hold that the jury should be instructed, in the event of a five-sixths verdict, that those jurors who dissent from a finding of causal negligence on the part of one or more of the parties are disqualified from participating in the apportionment of causal negligence.

Finally, we feel compelled to comment on the closing argument of defense counsel. When confronted with an allegation of improper closing argument, this court has extended great deference to the judgment of the trial court. Hardy v. Anderson, 241 Minn. 478, 63 N. W. 2d 814 (1954). However, there are bounds of propriety which we believe defense counsel exceeded in this case.

---

[10] Cf. 4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides (2 ed.) JIG II 151 S.

38

Without detailing the closing argument, it is sufficient to call attention to what we believe to be the most flagrant of defense counsel's comments. Knowing that one of the jurors was a stockholder in Northern States Power Company, a fact which came to light on voir dire, defense counsel argued:

"I concede that Northern States Power Company is a big company. But it is made up of small stockholders, and there are thousands of them. * * *"

The stockholder-juror dissented from the finding that NSP was causally negligent.

In fairness, we must point out that the argument of plaintiff's counsel was also less than professional, that plaintiff failed to object to defense counsel's argument and that a cautionary instruction was given the jury. Nevertheless, this style of argument is not conducive to a fair trial, and when coupled with the question of contributory negligence, the irregularities in the consideration of comparative negligence, and the disparity of risk in this case, we feel compelled to order a new trial.

Reversed and remanded.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.