Roy VIETHS, Plaintiff,

v.

**Wayne RIPLEY and Harry Munson, d.b.a. Munson Crane Rental Service, defendants and third party plaintiffs, Respondents,**

v.

**ARCHER–DANIELS–MIDLAND COMPANY, third party defendant, Appellant (48672)**

**ADM Milling Company, third party defendant, Appellant (48671 and 49180).**

Nos. 48671, 48672, 49180.

Supreme Court of Minnesota.

Aug. 15, 1980.

Popham, Haik, Schnobrich, Kaufman & Doty, G. Marc Whitehead, Allen W. Hinderaker, and Larry D. Espel, Minneapolis, for ADM Milling Co.

Ronald J. Johnson, Hopkins, for Archer-Daniels-Midland Co.

Gislason & Martin and Robert W. Gislason, Edina, for respondents.

Heard before ROGOSHESKE, SCOTT, and WAHL, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Third-party defendant ADM Milling Company (ADM) appeals from a judgment of the district court awarding defendants and third-party plaintiffs Harry Munson, d.b.a. Munson Crane and Rental Service, and Wayne Ripley, Munson's employee, 100% contribution of damages paid in the main action and from an order denying its motions for post-trial relief. Third-party defendant Archer-Daniels-Midland Company (Archer-Daniels) also appeals from that judgment which denied its counterclaim for workers compensation payments made to the plaintiff. The principal issues on appeal are whether the jury's findings that ADM was causally negligent, that Archer-Daniels was causally negligent, and that Archer-Daniels was ADM's agent are supported by the evidence. We conclude that there is sufficient evidence of causal negligence but not of agency and that, therefore,

while contribution is appropriate, the apportionment is in error. We reverse and remand.

The procedural background of this case is as follows. On June 21, 1973, Roy Vieths, an employee of Archer-Daniels, was injured in an industrial accident. He sued Munson and Ripley in tort; Munson and Ripley impleaded Archer-Daniels and ADM, a separate but wholly-owned subsidiary of Archer-Daniels. Archer-Daniels counterclaimed against Munson and Ripley for workers' compensation benefits paid to Vieths. Before trial, Vieths settled with Munson and Ripley for $120,000. Munson and Ripley reserved their third-party claims against Archer-Daniels and ADM, which claims were tried to a jury. The jury found Vieths 10% causally negligent, Archer-Daniels 40%, ADM 50%, and Munson and Ripley not negligent. In addition, the jury found that Archer-Daniels was acting as the agent of ADM at the time of the accident. Based upon that finding, the trial court imputed the negligence of Vieths and Archer-Daniels to ADM and permitted Munson to recover the full amount of the settlement from ADM. This appeal followed.

In 1971 Archer-Daniels purchased property in Red Wing, Minnesota. On the eastern portion of the property Archer-Daniels owns and operates an oil seed processing plant. On the western portion ADM, a wholly-owned subsidiary, owns and operates a flour milling plant. Although the two plants have entirely separate management and operations, there are unloading facilities located in and controlled by the flour plant but also used by the oil plant, including a truck scale and scale office. At the time of the accident, there were three uninsulated 12,500-volt powerlines approximately 30 feet north of the truck scale office and 20 to 24 feet above the ground. The lines were owned and controlled by ADM. Vieths, a general laborer and day-crew foreman in the employ of Archer-Daniels' oil plant, was supervising the operation of a crane in front of the truck scale office when the accident giving rise to this lawsuit occurred.

On the day of the accident, the oil plant superintendent telephoned Munson and requested a crane and operator to unload equipment at the oil plant. Munson sent Ripley, his sole employee, and instructed him to contact Vieths, who had supervised Ripley on other crane assignments at the plant. Vieths directed Ripley to the truck scale area and told him to place the crane in a position approximately halfway between the scale office on the crane's right and the powerlines on the left. The body of the crane was approximately 12 to 15 feet to the right of the powerlines. Vieths, acting as "oiler," stood on the ground next to the crane in full view of Ripley and with hand signals directed Ripley's operation of the crane. They proceeded in this manner to remove pieces of equipment from a truck parked in front of the crane and to place the equipment along the wall of the scale office on the right. At some point, Vieths, who was holding one of the crane cables, received an injury when electrical current from one of the powerlines was conducted by the crane to him. Examination of the powerline nearest the crane revealed a small nick in the wire. There was a dime-sized burn mark on the crane boom, several feet from the tip, on the side nearest the line.

At trial, dispute centered in part on whether Ripley had allowed the crane boom to come into contact with the powerlines. Ripley testified that he unloaded two or three pieces of equipment, returned the boom of the crane to a centered position, and locked the boom securely in place, approximately 8 feet to the right of the powerlines, ready for attachment of the next piece of equipment. He testified that he could see the boom and the powerlines, that he neither saw the boom move nor felt the crane tip, and that he never saw the boom touch the powerlines. While the boom was in this position, Ripley observed that Vieths had fallen. The only other witness, a member of Vieths' crew, also testified that he saw the boom and the powerlines and that he never saw the boom closer than 8 feet from them. No measurements were made, because Ripley had moved the boom to the

right, away from the powerlines, in order to facilitate climbing out of the cab of the crane to help Vieths.

Defendants called an expert witness, Dr. Sidney Larson, who testified that a current from a 12,500-volt powerline could not have arced 8 feet. He concluded that the boom must have touched or come within 1 to 2 inches of the powerline. On cross-examination, however, it was brought out that Larson had made only a cursory inspection of the premises during the noon recess on the day he testified and that he had not inspected the crane itself. Furthermore, Larson did not realize that some of the powerlines at the site had been eliminated in the 4 years between the accident and his inspection, so he could not say with certainty that he had inspected the specific powerline involved in the accident. No other expert testimony was presented.

■ 1. We first consider whether there was sufficient evidence for the jury reasonably to find causal negligence on the part of ADM. We observe that we do not follow a rule of absolute liability which would impose liability for injuries arising out of the maintenance of powerlines on the owner of the lines by reason of ownership alone. *Ferguson v. Northern States Power Co.*, 307 Minn. 26, 239 N.W.2d 190 (1976). Rather, we require persons who erect electric lines carrying high voltage current to exercise a degree of care in erecting and maintaining such lines commensurate with the danger to be apprehended from contact with the lines or escape of electricity therefrom. *Bunten v. Eastern Minnesota Power Co.*, 178 Minn. 604, 228 N.W. 332 (1929). Those engaged in transmitting electricity in this fashion are bound to anticipate ordinary use of the area surrounding the lines and to provide warnings and/or safeguards appropriate to the attendant risks. If an owner becomes aware of an unusual use, he must take measures appropriate to the risks associated with the unusual use. *Knutson v. Lambert*, 235 Minn. 328, 51 N.W.2d 580 (1951).

■ In our view, the record supports findings that ADM should have anticipated Vieths' use of the area surrounding the powerlines and the attendant risks and should have taken steps to avoid those risks. First, ADM should have realized that Archer-Daniels employees would be working in dangerous proximity to the wires. At the time of the accident, Archer-Daniels, with ADM's knowledge, was engaged in an oil plant expansion project in the area traditionally used by both companies. The equipment Vieths was helping to unload was for use in that project with proposed installation near the scale. It was normal procedure for Archer-Daniels' management to clear activities on ADM's property with ADM. Second, ADM knew that the uninsulated powerlines were hazardous and had discussed them with Archer-Daniels. Although ADM, as owner of the powerlines, was responsible for implementing any safeguards, it did not post warnings or insulate or relocate the lines. While the lines were clearly visible, the jury could have found that absence of warnings diminished the workers' recognition of danger. Moreover, the absence of notice of the voltage (which affects a current's arcing capabilities) would have prevented the workers from knowledgeably estimating a safe distance from the lines. We thus conclude that the jury permissibly found ADM causally negligent.

■ 2. Similarly, there was sufficient evidence to support the jury's finding that Archer-Daniels was negligent. The oil plant management had long been aware of and concerned about the danger posed by the powerlines and had considered insulating, relocating, or eliminating the powerlines as part of a general plan to revamp the entire electrical system of the plant. Nevertheless, nothing was done to effectuate these proposals, and Vieths testified that he was never warned about working near the lines, nor were there employee rules or instructions dealing specifically with electrical safety. Furthermore, the jury could have found that it was the oil plant superintendent who ordered that the unloading be done in the area of the powerlines, despite company policy against using

cranes close to powerlines. From this evidence, the jury could reasonably conclude that Archer-Daniels was causally negligent.

3. A more difficult question is whether there was sufficient evidence to support the jury's finding that Archer-Daniels was acting as an agent of ADM. The law is clear that an agency relationship does not exist unless there are facts showing that the alleged principal had the right to control the agent's conduct in performing the services. *Nicholas v. Hennepin Wheel Goods Co.*, 239 Minn. 269, 58 N.W.2d 572 (1953); *Frankle v. Twedt*, 234 Minn. 42, 47 N.W.2d 482 (1951); Restatement (Second) of Agency § 250, Comment a (1957). Munson and Ripley base their argument of agency on the theory that Archer-Daniels, through Vieths, was unloading the equipment not for itself but for the benefit of ADM. We are hard pressed to find support for this theory in the record, but, even if there were support, there is no evidence upon which the jury could reasonably find that ADM had any control whatsoever over the unloading process. Vieths was employed by Archer-Daniels, and all of the testimony indicated that he received his instructions for the unloading operation on the day of the accident from the Archer-Daniels oil plant superintendent. Not one employee of ADM was involved in the unloading. The fact that the unloading took place on property managed by ADM does not, without more, establish that ADM undertook to control the operation, in the absence of other evidence of an agency relationship. We hold, therefore, that the jury could not reasonably find that Archer-Daniels acted as an agent of ADM in performing the unloading operation and that the trial court erred in imputing the negligence of Archer-Daniels and its employee Vieths to ADM.[1]

4. The next contention raised by appellants is that Ripley, the crane operator, was negligent as a matter of law. We noted in *Peterson v. Minnesota Power & Light Co.*, 206 Minn. 268, 271–72, 288 N.W. 588, 589 (1939), that the "danger of electrical energy is a matter of common knowledge. * * * Judicial notice can be taken of the fact that it is generally known by people of even less education than [decedent] that danger lurks in electrical wires, especially to those unlearned in its properties." Ripley saw the powerlines and knew from a previous experience that even low voltage powerlines could be dangerous. He also was aware of Munson's policy with respect to powerlines: If the crane was to be operated within 15 feet of the powerline, Munson was to be summoned to act as "oiler." Nevertheless, Ripley worked with the boom of the crane only 8 feet from the powerlines and did not call Munson. Appellants argue that this constituted negligence as a matter of law.

We are not persuaded, however, that the jury's finding exonerating Ripley was manifestly and palpably contrary to the evidence. Ripley testified at trial that he had worked with Vieths on a number of previous occasions and that he had always depended upon Vieths to direct him safely. The jury could have found that it was reasonable for Ripley, who was not a plant employee, to assume that Vieths would warn him or direct him to some other location if the powerlines posed a danger. Although appellants claim the expert testimony of Dr. Larson required the jury to conclude that Ripley must have negligently allowed the boom to come into contact or near contact with the lines, the jury did not have to believe Dr. Larson, whose credibility was substantially impaired by cross-examination. The jury was entitled to believe the testimony of the eyewitnesses that the boom never touched the powerlines.

5. Appellants' final contention, that the trial court erred in instructing the

---

1. Munson and Ripley did not raise, and we do not decide, the possible effect of Minn.Stat. § 604.02, subd. 2 (1978), on the reallocation of the contributions to Munson and Ripley in the event that Archer-Daniels' workers' compensa-tion liability does not equal its allocated percentage of contribution. *See Lambertson v. Cincinnati Corp.*, 312 Minn. 114, 257 N.W.2d 679 (1977).

jury on portions of Article 4 of the National Electrical Safety Code, need not be decided. ADM argues that Article 4 applies only to powerlines owned by public utilities, not to powerlines owned by private companies such as ADM. However, the portions of Article 4 read to the jury would not have affected the outcome of this case. They simply expressed a common-sense duty of reasonable care on the part of an employer to adopt and enforce rules that would help to avoid electrical accidents. Since appellants undisputedly had such a duty, the instructions on Article 4 were not prejudicial.

We reverse and remand with instructions to adjust the allocation of liability of the parties in accordance with this opinion.

Reversed and remanded.

PETERSON and TODD, JJ., took no part in the consideration or decision of this case.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.